No. 24-60035

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

M.K., a minor by and through his father and next friend, Greg Koepp,

Plaintiff-Appellant,

v.

Pearl River County School District; P.B., a minor by and through his parents; P.A., a minor by and through his parents; I.L., a minor by and through his parents; L.M., a minor by and through his parents; W.L., a minor by and through his parents; Alan Lumpkin, individually and as Superintendent; Chris Penton, individually and as employee; Austin Alexander, individually and as employee; Stephanie Morris, individually and as employee; Tracey Crenshaw, individually and as employee; Blake Rutherford, individually and as employee; John Does 1-10,

Defendants-Appellees.

On Appeal from a Final Judgment of the
United States District Court for the Southern District of Mississippi
Case No. 1:22-CV-25-HSO-BWR, Hon. Halil Suleyman Ozerden

## OPENING BRIEF OF PLAINTIFF-APPELLANT
## M.K.

Daniel M. Waide
JOHNSON, RATLIFF &
 WAIDE, PLLC
1300 Hardy St.
PO Box 17738
Hattiesburg, MS 39404

Hasala Ariyaratne
Mariam Eskander
Claire Shennan
 Student Counsel

Brian Wolfman
Natasha R. Khan
Regina Wang
GEORGETOWN LAW APPELLATE
 COURTS IMMERSION CLINIC
600 New Jersey Ave., NW,
 Suite 312
Washington, D.C. 20001
(202) 661-6582
wolfmanb@georgetown.edu

Counsel for Plaintiff-Appellant M.K.

April 15, 2024

No. 24-60035

M.K., a minor by and through his father and next friend, Greg Koepp,

Plaintiff-Appellant,

v.

Pearl River County School District, et al.,

Defendants-Appellees.

**Certificate of Interested Persons**

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

Plaintiff-Appellant

   M.K., a minor by and through his father and next friend, Greg Koepp

Defendants-Appellee

   Pearl River County School District

   P.B., a minor by and through his parents

   P.A., a minor by and through his parents

   I.L., a minor by and through his parents

   L.M., a minor by and through his parents

   W.L., a minor by and through his parents

   Alan Lumpkin, individually and as Superintendent

   Chris Penton, individually and as employee

   Austin Alexander, individually and as employee

Stephanie Morris, individually and as employee

Tracey Crenshaw, individually and as employee

Blake Rutherford, individually and as employee

John Does 1-10

Johnson, Ratliff & Waide, PLLC

Daniel M. Waide

Georgetown Law Appellate Courts Immersion Clinic

Brian Wolfman

Natasha R. Khan

Regina Wang

Hasala Ariyaratne

Mariam Eskander

Claire Shennan

McAngus Goudelock & Courie LLC

Candice C. Hargett

Elizabeth Claire Scott


April 15, 2024                    /s/ Brian Wolfman
                                  Brian Wolfman

                                  Counsel for Plaintiff-Appellant

**Statement Regarding Oral Argument**

*Bostock v. Clayton County*, 590 U.S. 644 (2020), held that Title VII of the Civil Rights Act of 1964 prohibits discrimination because of an individual's sexual orientation. The first issue presented involves the question whether the prohibition against sex discrimination in Title IX of the Education Amendments Act of 1972 similarly covers discrimination on the basis of an individual's sexual orientation. Oral argument would aid this Court in considering that question. The second issue presented is whether Defendant Pearl River County School District was deliberately indifferent to sex-based harassment perpetrated on Plaintiff M.K. Oral argument would help the Court resolve that issue measured against the summary-judgment record.

# Table of Contents

Certificate of Interested Persons ........................................................... i

Statement Regarding Oral Argument ................................................ iii

Table of Authorities ......................................................................... vi

Jurisdictional Statement .................................................................... 1

Issues Presented ............................................................................... 1

Statement of the Case ....................................................................... 2

I.   Factual background ................................................................... 3

     A.   M.K. enrolls at Pearl River Central Middle School. ......................... 3

     B.   The next school year, M.K. faces severe and persistent sex-based harassment. ................................................................. 4

     C.   M.K.'s day-to-day school life is dominated by harassment .............. 5

     D.   M.K. is assaulted ...................................................................... 8

     E.   M.K. is further ridiculed, or punished, when he attempts to respond to the harassment ................................................ 9

     F.   An incident involving I.L. and M.K. leads to M.K.'s suspension. ................................................................. 10

     G.   M.K. is punished and assigned to the alternative Endeavor School. ................................................................. 12

     H.   The Endeavor School is not a viable alternative ........................ 13

     I.   M.K.'s parents try to provide him with an adequate school experience. ................................................................. 15

II.  Procedural background ............................................................ 16

Summary of Argument ................................................................... 19

Standard of Review ........................................................................ 20

Argument ...................................................................................... 21

I.  Sexual-orientation discrimination is sex discrimination under Title IX. ..................................................................................21

    A.  Discrimination "on the basis of" sex and discrimination "because of" sex are the same things. ................................................21

    B.  The School District had notice that sex discrimination unambiguously includes sexual-orientation discrimination. ..........26

II.  The School District was deliberately indifferent to severe and pervasive sexual harassment that deprived M.K. of access to an adequate public-school education. ...........................................27

    A.  M.K. experienced sex-based harassment that was so severe, pervasive, and objectively offensive that it deprived him of the public-school education to which he is entitled. ........................29

        1.  M.K. was harassed on the basis of sex. .......................................29

        2.  The harassment was so severe and pervasive that it deprived M.K. of access to educational opportunities. ...........32

    B.  The School District was deliberately indifferent to M.K.'s sex-based harassment and took affirmative steps that deprived him of educational opportunities. .....................................35

        1.  The School District ignored the repeated reports of harassment from M.K. and his parents. .....................................37

        2.  The School District's response to the bathroom incident was clearly unreasonable. .............................................40

Conclusion.............................................................................................42

Certificate of Service .............................................................................

Certificate of Compliance ......................................................................

# Table of Authorities

**Cases**                                                                **Page(s)**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville,*
    75 F.4th 760 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024)...................25

*Adams v. Sch. Bd. of St. Johns Cnty.,*
    57 F.4th 791 (11th Cir. 2022)...........................................................................25

*Bostock v. Clayton County,*
    590 U.S. 644 (2020)..........................................................iii, 1, 17, 19, 21, 22, 26

*Burns v. Johnson,*
    829 F.3d 1 (1st Cir. 2016) ................................................................................31

*City of Los Angeles Department of Water & Power v. Manhart,*
    435 U.S. 702 (1978)..........................................................................................23

*Clark Cnty. Sch. Dist. v. Bryan,*
    478 P.3d 344 (Nev. 2020) ................................................................................24

*Comcast Corp. v. Natl. Assn. of African Am.-Owned Media,*
    589 U.S. 327 (2020).........................................................................................26

*Davis. v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999)........................................................ 2, 26, 27, 28, 32, 33, 36

*Doe v. Fairfax County School Board,*
    1 F.4th 257 (4th Cir. 2021)..............................................................................36

*Doe v. Galster,*
    768 F.3d 611 (7th Cir. 2014)...........................................................................33

*Doe v. Sch. Dist. No. 1, Denver, Colorado,*
    970 F.3d 1300 (10th Cir. 2020).......................................................................33

*Dunn–McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*,
630 F.3d 431 (5th Cir. 2011) ...................................................................20

*EEOC v. Boh Bros. Const. Co., LLC*,
731 F.3d 444 (5th Cir. 2013) ..............................................................29, 30

*Estate of Lance v. Lewisville Indep. Sch. Dist.*,
743 F.3d 982 (5th Cir. 2014) ...................................................................36

*Farpella-Crosby v. Horizon Health Care*,
97 F.3d 803 (5th Cir. 1996) .....................................................................34

*Fennell v. Marion Indep. Sch. Dist.*,
804 F.3d 398 (5th Cir. 2015) ...................................................................36

*Grabowski v. Arizona Bd. of Regents*,
69 F.4th 1110 (9th Cir. 2023) ............................................................24, 30

*Grace v. Board of Trustees, Brook East Boston*,
85 F.4th 1 (1st Cir. 2023) .........................................................................37

*Gregory v. Daly*,
243 F.3d 687 (2d Cir. 2001) .....................................................................31

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021). ...........25, 27

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) ........................................................................23, 26, 27

*Jennings v. U. of N. Car.*,
482 F.3d 686 (4th Cir. 2007) ..............................................................32, 33

*Meritor Savings Bank v. Vinson*,
477 U.S. 57 (1986) ....................................................................................23

*Menzia v. Austin Indep. School District*,
  47 F.4th 354 (5th Cir. 2022)...................................................................36, 37

*Nichols v. Azteca Restaurant Enterprises, Inc.*,
  256 F.3d 864 (9th Cir. 2001) .............................................................. 33-34

*O'Rourke v. City of Providence*,
  235 F.3d 713 (1st Cir. 2001) ...................................................................31

*Oncale v. Sundowner Offshore Services, Inc.*,
  523 U.S. 75 (1998)..................................................................................33, 35

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989)......................................................................................29

*Roberts v. Glenn Industrial Group, Inc.*,
  998 F.3d 111 (4th Cir. 2021)..................................................................29

*Roe v. Cypress-Fairbanks Indep. Sch. Dist.*,
  53 F.4th 334 (5th Cir. 2022).............................16, 20, 28, 36, 37

*Sanches v. Carrollton-Farmers Branch Ind. Sch. Dist.*,
  647 F.3d 156 (5th Cir. 2011)..................................................................36, 38

*Taylor-Travis v. Jackson State U.*,
  984 F.3d 1107 (5th Cir. 2021).................................................................26

*University of Texas Southwestern Medical Center v. Nassar*,
  570 U.S. 338 (2013)......................................................................................23

*Vance v. Spencer Cnty. Pub. Sch. Dist.*,
  231 F.3d 253 (6th Cir. 2000)..................................................................37

*Wolfe v. Fayetteville, Arkansas Sch. Dist.*,
  648 F.3d 860 (8th Cir. 2011)..................................................................29

**Statutes and regulations**

20 U.S.C. § 1681(a) ....................................................................1, 17, 18, 21, 25, 28

20 U.S.C. § 1686 ....................................................................................25

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1367(a) ..............................................................................1

42 U.S.C. § 2000e-2(a)(1) ..........................................................1, 17, 21, 24

42 U.S.C. § 2000e-2(e) ........................................................................23

29 C.F.R. § 1604.11(a) ........................................................................24

34 C.F.R. § 106.33 ..............................................................................25

## Jurisdictional Statement

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a). ROA.15 (RE.67). On December 20, 2022, the district court granted in part and denied in part Defendants' motion to dismiss, disposing of all but two claims. ROA.147-61 (RE.15-29). Plaintiff's motion for reconsideration of that decision was denied on February 16, 2023. ROA.177-87 (RE.30-40). On December 21, 2023, the district court granted summary judgment to Defendants, disposing of all remaining claims of all parties, and entered a final judgment. ROA.344-69 (RE.41-66). On January 19, 2024, Plaintiff timely filed a notice of appeal. ROA.370-72 (RE.12-14). This Court has jurisdiction under 28 U.S.C. § 1291.

## Issues Presented

Title IX of the Education Amendments Act of 1972 provides that "No person in the United States shall, on the basis of sex … be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

**I.** Discrimination "because of" sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), includes discrimination "on the basis of" sexual orientation. *Bostock v. Clayton County*, 590 U.S. 644, 680 (2020). The first issue is whether discrimination "on the basis of" sex under Title IX includes sexual-orientation discrimination.

**II.** A school's deliberate indifference to severe and pervasive student-on-student sex-based harassment is sex discrimination under Title IX. *Davis. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). The second issue is whether a reasonable jury could find that Defendant Pearl River County School District was deliberately indifferent when it ignored numerous reports of incessant daily harassment based both on sexual orientation and sex-based stereotypes against Plaintiff M.K. and then suspended him based on a complaint from one of his principal harassers.

## Statement of the Case

Plaintiff-Appellant M.K. was only two weeks into sixth grade at Pearl River Central Middle School when he was first subjected to sex-based bullying. Over the following six weeks, until his suspension, M.K.'s days were dominated by relentless ridicule and harassment, as his classmates called him "gay" and "gay boy" throughout each day. One time, the harassment went beyond verbal abuse, and M.K. was shoved into a steel post by another student and injured. M.K. and his parents complained about this sex-based harassment to M.K.'s teachers and to school administrators multiple times, but no one took any action to investigate or curb the ceaseless bullying or to discipline the responsible students.

Instead, following an incident in a school bathroom between M.K. and one of his most persistent harassers, the School District punished M.K., not the harasser. An abbreviated and biased examination of the incident—in

which the School District readily embraced the harasser's story as fact—resulted in M.K.'s assignment to an "alternative" program, the Endeavor School, that lacked adequate safeguards and educational opportunities. Thus, after two months of harassment and ostracism, M.K.'s time at Pearl River Central Middle School came to a sudden and severe end. Despite M.K.'s desire to return to a safe public-school environment, and his parents' efforts to make that happen, the School District has proved unyielding in its punishment, and M.K. will not be allowed to re-enroll until he first attends Endeavor.

This brief argues that M.K. was subject to a pattern of severe, pervasive, and objectively offensive sex-based harassment, such that it deprived him of access to the public-school education to which he is entitled. Contrary to the district court's holding, discrimination based on sexual orientation is unlawful under Title IX, as it is under Title VII. By first ignoring reports from M.K. and his parents about the sex-based harassment, and then further depriving M.K. of educational opportunities, the School District demonstrated deliberate indifference in violation of Title IX.

## I.   Factual background

### A.   M.K. enrolls at Pearl River Central Middle School.

M.K. enrolled at Pearl River Central Middle School in Carriere, Mississippi, in fifth grade. ROA.244 (RE.92); ROA.218 (RE.80). It was his first time in public school, as he had been homeschooled previously by his

parents. ROA.218 (RE.80). M.K.'s integration into public school was initially smooth, albeit remote except for the last four weeks of the year due to COVID-19. ROA.15 (RE.67); ROA.49 (RE.76). He performed well academically, earning an "A" in most of his classes, struck up a friendship, liked going to school, and never complained about school to his parents. ROA.218-19 (RE.80-81); ROA.245 (RE.93); ROA.277 (RE.103). He was not involved in any fights or disciplinary actions, and his teachers never raised any concerns about his behavior. ROA.219, 225 (RE.81, 87); ROA.277 (RE.103). Occasionally, during recess, when M.K. played a video game with other students, they would call him "dog water"—meaning that he was not playing well. ROA.218-19 (RE.80-81). One student also made fun of him because he is short. ROA.219 (RE.81). But M.K. believed this to be ordinary teasing, rather than bullying, and "[i]t wasn't that big of a deal" to him. ROA.218-19 (RE.80-81).

### B. The next school year, M.K. faces severe and persistent sex-based harassment.

As M.K. began sixth grade in-person full-time, taunts about his video-game skills and height increased in frequency and severity. ROA.219-20 (RE.81-82). He was also soon subjected to nonstop homophobic bullying. *See* ROA.349-51 (RE.46-48). Within two weeks of the start of the school year, at least four students consistently tormented M.K. ROA.220 (RE.82); ROA.221-22 (RE.83-84).

The students continued to call M.K. "dog water" and "[t]rash" whenever he played video games. ROA.221 (RE.83). They would also Google-search images of a very small figure beside a very large figure, show the images to M.K., and tell him the small figure was him and the large figure was everyone else in the class. ROA.220 (RE.82). Unlike in fifth grade, at this point the insults were "overwhelming." ROA.221 (RE.83). "[T]hey would keep on saying it and saying it, and it would just drive [him] crazy." ROA.221 (RE.83).

Though M.K. does not identify as gay, this sex-based harassment soon shifted to other students calling him "gay" and "gay boy" incessantly, and, on one occasion, "fag." ROA.226 (RE.88); ROA.249 (RE.97). M.K. understood gay to mean that "[e]ither [] a boy wants to love another boy or a transgender," and sometimes he thought when other students called him gay, they were saying that he was a girl. ROA.226 (RE.88). He believed they may have called him gay because of the bright-colored clothing he wore, but it was also a broader effort to emasculate and mock him because he was small and bad at video games. ROA.226 (RE.88). No matter how many times M.K. was called gay, gay boy, or fag, he never called any of the students anything similar in return. ROA.225 (RE.87).

**C. M.K.'s day-to-day school life is dominated by harassment.**

M.K. took six classes a day—Science, Computer, Band, Math, Language Arts, and History. ROA.348-49 (RE.45-46). Every day, in four of his six

classes, he was tormented by at least one other student and sometimes more. His primary harassers were I.L., W.L., P.A., and P.B. ROA.221-22 (RE.83-84). The following was a typical school day.[1]

When M.K.'s father dropped him off at school, he noticed that M.K. "had a certain place to go to escape other students." ROA.245 (RE.93). M.K. would hurry to the cafeteria to avoid I.L. and W.L., who stood by a fence like "predator[s] waiting to pounce on something. [M.K.] was … a target." ROA.245 (RE.93).

M.K. would often arrive early to his first, and "most chaotic," class—Science—where the bullying would begin immediately. ROA.223 (RE.85). He used the time before class to play video games on his laptop, while W.L. and P.A. hounded him. ROA.221 (RE.83). M.K. reported their behavior to his Science teacher about ten times, and although she instructed the students to stop, it did not help. ROA.221 (RE.83). M.K.'s mother spoke with the Science teacher about the harassment, but rather than working with his mom to address it, the teacher instead raised concerns about M.K.'s "maturity level." ROA.277 (RE.103); ROA.279 (RE.105). No concerns about M.K.'s maturity had ever been flagged in fifth grade. ROA.279 (RE.105).

---

[1] Two of the student harassers have the same first name, which begins with P. It appears that P.A. was the student who called M.K. gay in several of his classes. ROA.220-23 (RE.82-85). Another student, P.B., is the student who physically assaulted M.K. ROA.16 (RE.68); ROA.50 (RE.77).

After Science, M.K. would go to Computer class. The students were all required to wear headphones and "be flat out quiet," so M.K. had a brief break from the harassment. ROA.221 (RE.83).

Next was Band, where M.K. played percussion. ROA.220-21 (RE.82-83). Band was "crazy" because I.L. and P.A. relentlessly called him "gay" and "gay boy." ROA.221-22 (RE.83-84). M.K. told his teacher once or twice that they were calling him "gay," but he never heard or saw his teacher say anything to I.L. or P.A. ROA.222 (RE.84).

After a lunch break, M.K. went to Math. The bullying during Math class was particularly merciless because I.L. sat "right behind [M.K.] whispering, calling [him] gay." ROA.222 (RE.84). M.K. told his teacher, Ms. Averett, about I.L.'s behavior three times. ROA.222 (RE.84). Ms. Averett addressed M.K. and I.L. together and told them she "didn't want to hear it anymore." ROA.222 (RE.84). M.K.'s understanding was that she not only didn't want to hear I.L. harassing M.K. anymore, but also that she didn't want to hear M.K. complaining anymore. ROA.222 (RE.84). He didn't see her have any conversations with I.L. alone. ROA.222 (RE.84).

M.K. had the same problem of relentless harassment in his second-to-last class—Language Arts—because I.L. was also in that class and again initially sat near M.K. ROA.222-23 (RE.84-85). M.K. complained twice to the teacher, Ms. Pierce, about I.L. calling him "gay," but it wasn't until she noticed them arguing about "how [M.K.'s] not gay" that she took any action, moving I.L.

to a seat across the room. ROA.223 (RE.85). She did nothing else to either discipline I.L. or support M.K. ROA.223 (RE.85).

In his final class of the day, History, M.K. had a respite from the harassment. ROA.223 (RE.85). Although all four harassers were in History with him, he was able to choose where he sat most of the time, and purposefully sat far away from I.L., W.L., P.A., and P.B. ROA.223 (RE.85).

At the end of the school day, M.K.'s older sister's daughter, who was a year ahead of M.K., would sometimes wait for him and escort him out of the school to provide additional protection. ROA.245 (RE.93).

A few weeks after the torment began, M.K. told his parents about it. ROA.245 (RE.93); ROA.277 (RE.103). To help him navigate the situation, M.K.'s father told him that he "must clarify [the harassment] with [his] teachers. That should not be." ROA.245 (RE.93).

### D. M.K. is assaulted.

After several weeks of nonstop verbal abuse, the harassment became physical when M.K. tried to stand up for himself. He was walking on the sidewalk with a friend during a break between lunch and class when one of his harassers, P.B., unzipped his friend's backpack and started to unzip M.K.'s backpack too. ROA.223 (RE.85). When M.K. attempted to prevent P.B. from doing so by lightly slapping him, P.B. responded with force, shoving M.K. into a steel post, causing him to fall to the concrete sidewalk. ROA.223-24 (RE.85-86); ROA.246 (RE.94); ROA.16 (RE.68); ROA.50 (RE.77).

M.K. suffered injuries to his face when he hit the post and to his elbow when he fell. ROA.224 (RE.86); ROA.246 (RE.94). M.K. reported the assault to his teacher in the next class and later informed the assistant principal, Chris Penton, as well. ROA.224 (RE.86). Although Mr. Penton may have spoken to P.B. about it, no disciplinary action was taken. ROA.224 (RE.86); ROA.16 (RE.68). Mr. Penton spoke with M.K. about slapping P.B. as well. ROA.224 (RE.86).

The next morning at drop-off, M.K.'s father spoke with Assistant Principal Penton about the assault and the continued constant harassment of his son. ROA.245-47 (RE.93-95). He named the students involved and told Mr. Penton that they were "calling [M.K.] gay, queer, little boy, et cetera." ROA.247 (RE.95). He noted that Mr. Penton and a teacher witnessed P.B.'s assault on M.K. ROA.246-47 (RE.94-95). Mr. Penton acknowledged that he "knew certain kids were doing certain things," but did not offer any plans to prevent or correct their behavior. ROA.247 (RE.95).

### E. M.K. is further ridiculed, or punished, when he attempts to respond to the harassment.

Because the school's teachers and administrators failed to intervene, M.K. occasionally attempted to respond to the harassment himself. Sometimes, when students called him gay, he would blow kisses at them. ROA.226 (RE.88). Unfortunately, that only made the sex-based harassment worse. ROA.226 (RE.88). On one occasion, M.K. reacted with an insult of his own, to which the school was uncharacteristically responsive. M.K. was about to

go into Math when one of his harassers, W.L., "was real[ly] bullying [M.K.] because he [was] calling [M.K.] gay," and M.K. cursed at him. ROA.224-25 (RE.86-87). Their teacher, Ms. Averett, overheard, and rather than investigating the incident further or questioning M.K.'s motivation for swearing, M.K. was "written up." ROA.225 (RE.87). When Ms. Averett contacted M.K.'s mother to discuss the incident, M.K.'s mother raised the nonstop harassment. ROA.277-78 (RE.103-04). This was the first of at least two incidents in which the school chose to admonish and correct M.K.'s response to the ceaseless sex-based harassment, rather than try to curtail the harassment itself. As we now explain, the second incident would result in M.K.'s effective expulsion by the School District.

## F. An incident involving I.L. and M.K. leads to M.K.'s suspension.

After more than six weeks of relentless harassment—and the school's inadequate, if not actively harmful, responses—M.K.'s harrowing experience came to a head when an interaction with I.L. in a school bathroom resulted in M.K.'s suspension. ROA.226-28 (RE.88-90). I.L. is the student who often waited outside school at the start of the day "like a predator" and harassed M.K. throughout Band, Math, and Language Arts. ROA.245 (RE.93); ROA.221-23, 226 (RE.83-85, 88).

On this day, I.L. had been tormenting M.K. all day, as usual. ROA.17 (RE.69). While in Language Arts, M.K. received permission from the teacher,

10

Ms. Pierce, to go to the bathroom. ROA.226 (RE.88). I.L. then requested to go to the bathroom at the same time. ROA.226 (RE.88).

"For some reason," Ms. Pierce, who had previously needed to separate M.K. and I.L. for fighting over "how [M.K.'s] not gay," let I.L. follow M.K. to the bathroom. ROA.223, 226 (RE.85, 88). M.K. used the urinal while I.L. used the stall, and when M.K. turned from the urinal to "fix [him]self up," I.L., who had finished in the stall and was at the sink, saw M.K.'s genitals in the mirror. ROA.226 (RE.88). As I.L. and M.K. exited the restroom, I.L. started "making faces like [he's] going to tell the teacher" that he saw M.K.'s genitals. ROA.227 (RE.89). M.K. then told I.L. to stop, and I.L. responded by "making a goofy face." ROA.227 (RE.89).

I.L. then spoke with Ms. Pierce, who in turn asked M.K. whether he had intentionally flashed I.L. ROA.227 (RE.89). M.K. told her that he had not, but he was soon called into the principal's office, where he was questioned by Principal Austin Alexander and Assistant Principal Penton without his parents present. ROA.227 (RE.89); ROA.247 (RE.95). Mr. Penton explained that I.L. told them M.K. had called I.L.'s name to get him to look over when M.K.'s genitals were visible. ROA.227 (RE.89).

M.K. initially denied the story, but Mr. Penton pressured M.K. to admit to intentionally flashing I.L. ROA.227 (RE.89). Mr. Penton "just said Stop lying over and over and over." ROA.227 (RE.89). By the time M.K.'s mother got to the school, M.K. had admitted to exposing himself to I.L. ROA.278

(RE.104). Upon her arrival, Mr. Alexander and Mr. Penton, both of whom had "talked to [M.K.] over and over," told her "they had talked to him long enough to get him to admit that he did what they said" he did. ROA.278 (RE.104).

After leaving school, M.K. told both of his parents that I.L. had seen him in the mirror as he "straightened himself out" after using the urinal. ROA.248 (RE.96); ROA.278 (RE.104). Later, M.K. did tell his mother "he showed himself to show him that he wasn't gay because he thought gay meant that a boy thought he was a girl." ROA.278 (RE.104). He also told his father that I.L. had waited in the bathroom after finishing in the stall, watching M.K. ROA.248 (RE.96).

## G. M.K. is punished and assigned to the alternative Endeavor School.

Following the incident, no action was taken to investigate I.L.'s role in it, or his daily, weeks-on-end harassment of M.K. Instead, the School District suspended M.K. for five days and required him to attend a disciplinary hearing where I.L. was allowed to testify against him. ROA.278-79 (RE.104-05); ROA.31-32 (RE.73-74); ROA.228 (RE.90). A Committee consisting of several teachers, Assistant Principal Penton, Principal Alexander, and School District Superintendent Alan Lumpkin, conducted the hearing. ROA.31-32 (RE.73-74); ROA.18 (RE.70); ROA.51 (RE.78). The Committee asked M.K. only a few questions. ROA.278-79 (RE.104-05). M.K. told the Committee that the bathroom incident was an accident, but he also

acknowledged he had previously admitted to intentionally flashing I.L. when Principal Alexander and Assistant Principal Penton "questioned him for quite a while before letting [his mother] know where he was." ROA.228 (RE.90); ROA.249 (RE.97) (testimony of Greg Koepp).

When the Committee asked M.K.'s parents what they would recommend, they suggested counseling. ROA.279 (RE.105). M.K.'s mother believed the five-day suspension was sufficient discipline. ROA.279 (RE.105). The Committee did not follow M.K.'s parents' recommendation and instead doled out a much harsher punishment. They recommended that M.K. be suspended from the middle school and sent to the Pearl River Central Endeavor School, an "alternative" school in the district, for six weeks—that is, through the end of the semester. ROA.228 (RE.90); ROA.31-32 (RE.73-74). M.K.'s parents promptly appealed the decision to the School District's Board of Trustees. ROA.33 (RE.75). Over a month later, two-thirds of the purported length of M.K.'s punishment, the Trustees upheld the Disciplinary Committee's decision. ROA.19 (RE.71).

## H. The Endeavor School is not a viable alternative.

After the Committee's decision, M.K. and his parents visited the Endeavor School and found it entirely unsatisfactory in terms of safety and educational opportunities. The campus, M.K.'s father testified, was a "little homemade prison." ROA.251 (RE.99). The school grounds were surrounded by a tall chain-link fence, with metal detectors at the entrance. ROA.250

(RE.98). During the visit, M.K. and his parents were not allowed to tour the school. ROA.250 (RE.98). They met Endeavor's principal only at the front entrance, where he informed M.K.'s parents that they would never have access to the premises beyond that point. ROA.250-51 (RE.98-99).

M.K.'s mother was concerned for her son's safety at Endeavor, and so was M.K. ROA.279 (RE.105); ROA.228 (RE.90). He was frightened by Endeavor's metal detectors and the students there. ROA.228 (RE.90). He believed that "if you're going to alternative school that means you would have [done] something bad, so that led [him] to think that everybody there was mostly a bad kid." ROA.228 (RE.90). On top of the school's restrictive environment, M.K.'s parents were particularly concerned that M.K. wouldn't be able to continue Band class, as they wanted M.K. to maintain his percussion practice. ROA.250-51 (RE.98-99). Superintendent Lumpkin told them at one point that the middle school's band teacher would be brought into Endeavor, but the teacher herself told M.K.'s mother that that was untrue. ROA.279 (RE.105).

Superintendent Lumpkin gave M.K.'s parents three choices: (1) uproot their home and move to another school district; (2) withdraw M.K. and homeschool him; or (3) have M.K. attend Endeavor for the six-week period through the end of the semester. ROA.250-51 (RE.98-99). Because Endeavor was not suitable for M.K.'s education, his parents reluctantly returned to homeschooling. ROA.251 (RE.99).

## I. M.K.'s parents try to provide him with an adequate school experience.

To ensure that M.K. had an appropriate learning and social environment, his parents tried to re-enroll him at the middle school after six weeks of homeschooling, but the School District refused. M.K.'s father, through counsel, reached out to Superintendent Lumpkin at the beginning of 2022 to confirm that M.K. could re-enroll for the spring semester. ROA.19 (RE.71). The family was then informed that M.K. could not re-enroll—ever—at the middle school unless he attended Endeavor for six weeks. ROA.20 (RE.72); ROA.51 (RE.78); ROA.346 (RE.43).

M.K. "want[s] to be back in a public school" and, despite the School District's resistance, his parents are working hard to attain appropriate educational and social opportunities for him. ROA.228 (RE.90). A few months after the suspension, M.K. spoke with his aunt, a psychologist, who wrote a letter recommending that M.K. be back with his peers at the middle school. ROA.253 (RE.101). M.K.'s parents have also tried to sign him up for two counseling programs, but the programs have a waitlist of over a year. ROA.253 (RE.101); ROA.280 (RE.106). They have investigated private schools, paying special taxes so M.K. can attend public school in another district, or even moving. ROA.279 (RE.105); ROA.252 (RE.100). M.K.'s mother prefers to enroll M.K. in a public school within the School District, but they would rather move to another school district than enroll M.K. at Endeavor. ROA.279 (RE.105); ROA.252 (RE.100).

As of May 2023, M.K.'s parents were spending over $2,000 a year to homeschool him, including the cost of a laptop and other necessary educational materials that would be provided for free to a student attending the School District's public schools. ROA.252-53 (RE.100-01).

## II.   Procedural background

M.K. sued the School District in the Southern District of Mississippi under Title IX of the Education Amendments Act of 1972. ROA.21-23. He pleaded other claims and sued school administrators and other individuals, but only M.K.'s Title IX deliberate-indifference sex-discrimination claim against the School District is pursued here.

A Title IX deliberate-indifference claim requires the plaintiff to prove that (1) the defendant had actual knowledge of the harassment; (2) the harasser was under the defendant's control; (3) the harassment was based on the victim's sex; (4) the harassment was severe, pervasive, and objectively offensive such that it effectively barred the victim's access to an educational opportunity or benefit; and (5) the defendant was deliberately indifferent to the harassment. ROA.355 (RE.52) (citing *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022)).

After discovery, the district court granted summary judgment to the School District as to the third and fourth elements of the Title IX claim

(without reaching the fifth element). ROA.355 (RE.52).[2] The court first held, as a matter of law, that Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), does not extend to discrimination on the basis of sexual orientation. ROA.355-63 (RE.52-60). The court distinguished *Bostock v. Clayton County*, 590 U.S. 644 (2020), which held that Title VII's prohibition on workplace discrimination "because of … sex," 42 U.S.C. § 2000e-2(a)(1), includes discrimination based on sexual orientation. ROA.355-63 (RE.52-60).

The district court refused to apply *Bostock*'s reasoning, differentiating textually between Title VII's prohibition of discrimination "because of … sex" and Title IX's prohibition of discrimination "on the basis of sex." ROA.359-60 (RE.56-57). The court referred to *Bostock*'s observation that "because of" means that an adverse employment action may have "multiple but-for causes," including causes other than an employee's sexual orientation, and still violate Title VII. ROA.360 (RE.57). Although not clear, it may have been the district court's view that Title IX's use of "on the basis of sex" means that, to discriminate under the statute, sex must be the only basis for the alleged discrimination. ROA.360 (RE.57).

The district court went on to observe that Title IX was enacted under the Spending Clause, while Title VII was enacted under the Commerce Clause.

---

[2] The School District conceded that there are factual disputes as to the first element—that the School District had actual knowledge of the harassment. ROA.310. The School District did not dispute that M.K. met the second element of the claim—that the harassers were under the School District's control. ROA.310.

ROA.361 (RE.58). The court noted that when legislating under the Spending Clause, Congress may impose conditions on recipients of federal funds only when it provides notice of those conditions. ROA.361-62 (RE.58-59). The court determined that Congress has not provided notice that Title IX's prohibition on sex discrimination covers sexual-orientation discrimination and therefore that M.K. had not been discriminated against "on the basis of sex." 20 U.S.C. § 1681(a); ROA.362 (RE.59).

The district court also determined that the harassment perpetrated against M.K. was not severe, pervasive, and objectively offensive such that it effectively barred M.K.'s access to an educational opportunity or benefit. The court said that M.K. "was called gay by several other students" in multiple classes only "during the first month or two of the school year," but did not mention that this period was the entire time the School District permitted M.K. to attend sixth grade at the middle school. ROA.364 (RE.61). The court refused to consider as sex-based either the harassers' use of certain pejorative terms in Science class or P.B.'s assault against M.K. and, thus, did not view them as evidence of severity and pervasiveness. ROA.364 n.2 (RE.61 n.2).

At the end of the day, the district court deemed the harassment mere "insults, banter [and] teasing that was upsetting to M.K." rather than sex discrimination barred by Title IX. ROA.365 (RE.62) (quotation marks omitted). The court interpreted M.K.'s testimony that he wanted to return to

public school as evidence that the harassment was not so severe and pervasive as to effectively deny him access to education. ROA.365 (RE.62).

## Summary of Argument

**I.** Sex discrimination under Title IX includes discrimination "on the basis of" sexual orientation, just like sex discrimination includes discrimination "because of" sexual orientation under Title VII. *See Bostock v. Clayton County*, 590 U.S. 644, 680 (2020). Fifty years of Supreme Court precedent and other sources of statutory meaning underscore that no difference exists between the phrase "on the basis of" used in Title IX and the phrase "because of" used in Title VII.

The School District cannot escape liability because Title IX was enacted under the Spending Clause. The School District had notice that Title IX's ban on sex discrimination covers the conduct alleged here because that conduct violated the clear terms of the statute.

**II.** M.K. was deprived of access to the public-school education to which he is entitled when he was subjected to incessant daily homophobic and other sex-based harassment. The harassers used explicitly sexual language, calling M.K. "gay" and "fag," and relied on stereotypes to highlight M.K.'s perceived sex-based inadequacies. Despite having actual knowledge of this harassment, the school never made any effort to investigate it or to protect M.K. After repeatedly ignoring reports that M.K. was the subject of ceaseless harassment and insults for more than six weeks, the School District

suspended M.K. based solely on a complaint by one of his principal harassers regarding an encounter in a bathroom.

The School District never gave M.K. a fair opportunity to relay his side of the story before punishing him. The School District refuses to allow M.K. back to public school unless he first attends an unsafe alternative institution for six weeks, turning M.K.'s suspension into an effective expulsion. The School District was clearly unreasonable both in turning a blind eye to M.K.'s harassment and in its draconian response to the bathroom incident. Summary judgment was improper because a reasonable jury could conclude that the Pearl River School District was deliberately indifferent to the severe and pervasive sex-based harassment experienced by M.K.

## Standard of Review

This Court reviews the district court's grant of summary judgment de novo. *See, e.g., Dunn–McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 435 (5th Cir. 2011). "The sole question is whether a reasonable jury drawing all inferences in favor of the nonmoving party," here, M.K., "could arrive at a verdict in that party's favor." *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 340 (5th Cir. 2022) (quotation marks omitted).

**Argument**

## I. Sexual-orientation discrimination is sex discrimination under Title IX.

Title IX of the Education Amendments Act of 1972 provides that "No person in the United States shall, on the basis of sex … be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX's predecessor in the workplace, Title VII of the Civil Rights Act of 1964, makes it unlawful for an employer to "discriminate against any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In *Bostock v. Clayton County*, the Supreme Court held that sex discrimination under Title VII includes discrimination "on the basis of homosexuality or transgender status." 590 U.S. 644, 680 (2020). Sex discrimination means the same thing under Title IX. The district court was wrong to hold otherwise.

### A. Discrimination "on the basis of" sex and discrimination "because of" sex are the same thing.

*Bostock v. Clayton County* held that "discrimination on the basis of homosexuality or transgender status" is "discrimination because of sex." 590 U.S. 644, 666 (2020). "[H]omosexuality and transgender status are inextricably bound up with sex" and "to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." *Id.* at 660-61. The district court erred when it held that

Title VII's prohibition against discrimination "because of sex"—which, as *Bostock* held, includes sexual orientation and gender identity—differs from Title IX's prohibition against discrimination "on the basis of" sex.

**1.** *Bostock* itself described Title VII as outlawing "discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin," 590 U.S. at 650 (emphasis added), though Title VII's text uses the term "because of." The Supreme Court majority used "on the basis of" to mean "because of" many times.[3] The dissenting Justices did the same.[4]

---

[3] *Bostock*, 590 U.S. at 650 ("There, in Title VII, Congress outlawed discrimination in the workplace on the basis of race, color, religion, sex, or national origin."); *id.* at 653 (Title VII prohibits "discrimination on the basis of motherhood."); *id.* at 654 ("Each employee brought suit under Title VII alleging unlawful discrimination on the basis of sex."); *id.* at 662 ("To be sure, that employer's ultimate goal might be to discriminate on the basis of sexual orientation."); *id.* at 664 ("An employer's intentional discrimination on the basis of sex is no more permissible when it is prompted by some further intention …."); *id.* at 666 ("Seeking footing in the statutory text, they begin by advancing a number of reasons why discrimination on the basis of homosexuality or transgender status doesn't involve discrimination because of sex."); *id.* ("[T]he employers assert that discrimination on the basis of homosexuality and transgender status aren't referred to as sex discrimination in ordinary conversation."); *id.* at 680 ("We can't deny that today's holding—that employers are prohibited from firing employees on the basis of homosexuality or transgender status—is an elephant.").

[4] *Id.* at 720 (Alito, J., dissenting) ("An employer who discriminates equally on the basis of sexual orientation or gender identity applies the same criterion to every affected individual regardless of sex.") (emphasis omitted); *id.* at 781 n.1 (Kavanaugh, J., dissenting) ("[T]his opinion's legal analysis of discrimination on the basis of sexual orientation would apply in much the same way to discrimination on the basis of gender identity.").

The Supreme Court's other Title VII decisions have similarly used "on the basis of" for over fifty years, though, again, Title VII uses "because of." For example, *City of Los Angeles Department of Water & Power v. Manhart* held that when "individuals receive[] smaller paychecks because of their sex" that is "discriminat[ion] on the basis of sex." 435 U.S. 702, 708, 715 (1978). *Meritor Savings Bank v. Vinson* held that "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." 477 U.S. 57, 64 (1986). *University of Texas Southwestern Medical Center v. Nassar* explained that "Title VII defines the term 'unlawful employment practice' as discrimination on the basis of any of seven prohibited criteria." 570 U.S. 338, 359-60 (2013). And, in interpreting Title IX itself, the Supreme Court has held that "when a funding recipient retaliates against a person *because* he complains of sex discrimination, th[at] constitutes intentional 'discrimination' 'on the basis of sex.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). In all these decisions, the Supreme Court used "on the basis of" to mean "because of," for the obvious reason that the two terms are synonymous.

**2.** Other sources of statutory meaning confirm that "because of" and "on the basis of" mean the same thing. Congress exempted from Title VII's broad workplace-discrimination ban certain bona fide occupational qualifications established "on the basis of … sex," 42 U.S.C. § 2000e-2(e), and that exception cannot mean something different from the phrase "because of … sex" used

in the ban itself. *Id.* § 2000e-2(a)(1). Congress was simply using the two terms interchangeably. And in implementing Title VII's "because of" language, the Equal Employment Opportunity Commission's regulations state that "[h]arassment *on the basis of sex* is a violation of" Title VII. 29 C.F.R. § 1604.11(a) (emphasis added). The agency used one phrase as a substitute for the other because, in common parlance, "because of" and "on the basis of" are one and the same.

**3.** No appellate court to consider a Title IX sexual-harassment claim post-*Bostock* has drawn a distinction between the "because of" language in Title VII and the "on the basis of" language in Title IX. The Ninth Circuit has expressly rejected any distinction, holding that "discrimination on the basis of sexual orientation is a form of sex-based discrimination under Title IX." *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). And the Nevada Supreme Court has also "appl[ied] *Bostock*'s reasoning" to "conclude that Title IX's prohibition of discrimination 'on the basis of sex' … encompasses discrimination against homosexual or transgender individuals." *Clark Cnty. Sch. Dist. v. Bryan*, 478 P.3d 344, 354 (Nev. 2020).

Beyond those decisions, three courts of appeals have considered Title IX challenges to policies regarding use of bathrooms by transgender individuals, and none of them has suggested that Title IX escapes *Bostock*. Quite the contrary. "Applying *Bostock*'s reasoning to Title IX," the Seventh Circuit had "no trouble concluding that discrimination against transgender

persons is sex discrimination for Title IX purposes, just as it is for Title VII purposes." *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024). The Fourth Circuit has held that a bathroom policy that prevented a transgender boy from using the boys' restroom was unlawful, using *Bostock* to "guide[] [its] evaluation of claims under Title IX." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021). And though the Eleventh Circuit upheld a similar bathroom policy, it did so only because the policy, in the court's view, was authorized by Title IX's statutory and regulatory carve-outs that "expressly allow[ed] the School Board to provide separate bathrooms 'on the basis of sex.'" *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 814 (11th Cir. 2022) (en banc) (citing 20 U.S.C. §§ 1681(a), 1686 and 34 C.F.R. § 106.33).

**4.** Though not entirely clear, the district court seems to have differentiated "on the basis of" and "because of" on the theory that, by using the word "the," Title IX imposes a sole-cause (not a but-for-cause) standard for establishing causation. ROA.360 (RE.57) (observing that "the student's sex must be *the* basis of Title IX harassment"). Whatever the upshot of this suggestion—and we don't know what it is—the district court's premise is wrong because Title IX does not impose a sole-cause standard.

The "ancient and simple 'but for' common law causation test [is] the 'default' or 'background' rule against which Congress is normally presumed

to have legislated when creating its own new causes of action." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 332 (2020). That but-for standard applies "when it comes to federal antidiscrimination laws." *Id.* In the Title IX retaliation context—in which a plaintiff alleges that she suffered retaliation "on the basis of sex" because she complained about sex discrimination, *Jackson*, 544 U.S. at 179—this Court itself has rejected the argument that the plaintiff's complaint "must be the sole reason" for the retaliatory conduct. *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1119 (5th Cir. 2021). In sum, Title IX, like Title VII, embraces but-for causation, and *Bostock* applies in full force.

## B. The School District had notice that sex discrimination unambiguously includes sexual-orientation discrimination.

The district court erred in relying on the clear-statement requirement for Spending Clause legislation to exclude sexual-orientation discrimination from Title IX's coverage. ROA.361-62 (RE.58-59). That requirement ensures that "recipients of federal funding ha[ve] adequate notice that they could be liable for the conduct at issue." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). Here, this requirement was satisfied because sexual-orientation discrimination has "always been prohibited" by Title IX's plain terms. *See Bostock v. Clayton County*, 590 U.S. 666, 662 (2020). "[D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex," *id.* at 669—the very thing prohibited by Title IX. That ends any Spending Clause concern.

And that is how Title IX has been interpreted for decades. In *Davis*, the Supreme Court established that a school board can be liable for student-on-student sexual harassment. 526 U.S. at 643. The Spending Clause origin of Title IX posed no problem, the Court explained, because the school board's "*own* decision to remain idle in the face of known student-on-student harassment" is "intentional conduct that violates the clear terms of the statute." *Id.* at 641-42. Similarly, in *Jackson v. Birmingham Board of Education*, the Supreme Court recognized for the first time that "retaliation falls within [Title IX's] prohibition of intentional discrimination on the basis of sex." 544 U.S. 167, 178 (2005). The Court rejected the school board's argument that it was not on notice: "retaliation against individuals because they complain of sex discrimination" violates the clear terms of the statute and "Title IX itself therefore supplied sufficient notice." *Id.* at 183.

In any case, because the conduct that M.K. alleges took place well after *Bostock* was decided, the School District was on notice that sexual-orientation discrimination is sex discrimination. Put otherwise, "*Bostock* foreclose[d] [the argument] that 'on the basis of sex' is ambiguous." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 n.18 (4th Cir. 2020).

## II. The School District was deliberately indifferent to severe and pervasive sexual harassment that deprived M.K. of access to an adequate public-school education.

Without making any effort to investigate or correct the ceaseless sex-based harassment perpetrated on M.K., the School District suspended M.K.

based on a harasser's complaint and refuses to allow M.K. back in public school until he serves a six-week punishment at Endeavor. These deprivations—first denying M.K. a safe, non-discriminatory environment in which to learn and then denying him the right to attend a traditional public school—are exactly the kinds of harms that Title IX was enacted to prevent.

Title IX was designed to "specifically shield[]" students "from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity receiving Federal financial assistance.'" *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (quoting 20 U.S.C. § 1681(a)). Sexual harassment, including student-on-student sexual harassment, is "discrimination" under Title IX. *Id.* School districts are liable for student-on-student harassment when they are "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.*; *see also Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) (breaking out the elements).

The district court erred in granting summary judgment to the School District because a reasonable jury could conclude that M.K. was harassed by his peers on the basis of sex and that the harassment was so severe and pervasive that it deprived him of educational benefits, including eventually his effective expulsion from public school. And because the School District's

teachers and administrators had actual knowledge of the sex-based harassment and took no meaningful steps to investigate the harassment or to protect M.K., a reasonable jury could find the School District liable for deliberate indifference.

### A. M.K. experienced sex-based harassment that was so severe, pervasive, and objectively offensive that it deprived him of the public-school education to which he is entitled.

#### 1. M.K. was harassed on the basis of sex.

**a.** As M.K. started sixth grade at Pearl River Central Middle School, he quickly became the target of near-constant sex-based harassment because he was perceived by his harassers as failing to meet sex-based norms or stereotypes. Use of sex-based language and stereotypes is evidence of sex discrimination. *See, e.g.*, *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 457 (5th Cir. 2013); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989); *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011). As relevant here, "a plaintiff may prove that same-sex harassment is based on sex where the plaintiff was perceived as not conforming to traditional male stereotypes." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 121 (4th Cir. 2021).

Explicitly sex-based remarks like homophobic slurs or comments insinuating that the plaintiff is not a "manly-enough man" can be evidence of discrimination based on the plaintiff's sex. *Boh Bros.*, 731 F.3d at 457. A harasser's use of "sex-based epithets like 'fa—ot,' 'pu—y,' and 'princess'"

against a male co-worker supports a sexual-harassment claim. *Id.* Similarly, calling a teammate "gay" or "a fag" supports a sex-discrimination claim under Title IX because Title IX bars both sexual-orientation discrimination, and separately, discrimination on the basis of a perceived failure to conform to sex-based stereotypes. *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1114, 1116-17 (9th Cir. 2023).

The harassment leveled against M.K.—whether viewed as based on M.K.'s perceived sexual orientation or his (purported) failure to meet traditional male stereotypes—was based on sex. Much of it was explicitly sex based: M.K. was tormented as "gay," "gay boy," and "fag" for much of every school day. ROA.222 (RE.84); ROA.249 (RE.97).

Moreover, a reasonable jury could conclude that the bullies targeted M.K. and sought to punish him because he did not conform to their stereotypical views on sex. The harassers preyed on M.K. because he was small in stature (and thus perceived as weak), wore bright colors, and was bad at games—traits that the harassers tried to exploit to taunt M.K. as a non-masculine boy. ROA.219-21, 226 (RE.81-83, 88). For instance, M.K.'s tormentors would Google-search images of a very small figure beside a very large figure, show the images to M.K., and tell him that he was the small figure and the large figure was everyone else in the class. ROA.220 (RE.82).

**b.** And when, as here, the evidence includes explicit sex-based harassment, like homophobic insults, facially neutral conduct is properly

viewed as part of the pattern of sexual harassment. Thus, courts should "avoid … dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct." *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001). A pattern of sex-based harassment may include "incidents of nonsexual conduct" like "work sabotage, exclusion, denial of support, and humiliation"—all of which are evidence of sex-based harassment. *Id.* at 730; *see also Burns v. Johnson*, 829 F.3d 1, 14, 17 (1st Cir. 2016) (holding that liability may be established based on a defendant's reliance on sex-based stereotypes and that, along with sex-based comments, the transfer of a female employee's work to a group of male employees supported an inference that the female employee was harassed on the basis of sex); *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001) (citing cases).

Though some of the bullying M.K. suffered was not explicitly sexual, it was part of a pattern of sex-based harassment. As the case law just reviewed demonstrates, when sex-based insults are intermingled with hostile conduct that is non-sexual in isolation, the totality of the conduct may be attributed to sex-based animus. *See, e.g.*, *O'Rourke*, 235 F.3d at 729-30. Thus, the district court erred when it refused to take into account that M.K. was called "dog water" for being bad at games in addition to being called "gay," "gay boy," and "fag." ROA.364 n.2 (RE.61 n.2). For the same reason, the district court was wrong that the violent incident in which M.K. was shoved into a pole

by one of his harassers could not be viewed by a jury as intertwined with, and thus a part of, a pattern of sex-based harassment. *See* ROA.364 n.2 (RE.61 n.2). A reasonable jury therefore could find that the entire pattern of harassment was based on sex.

> **2.  The harassment was so severe and pervasive that it deprived M.K. of access to educational opportunities.**

M.K. experienced daily harassment that deprived him of the full benefits of a public-school education. Critically, M.K. did not receive the education to which he is entitled when he was incessantly sexually harassed in class after class, day after day. This deprivation was then exacerbated when the School District suspended him and then effectively expelled him by barring his return to public school—ever—until he spends six weeks in an unsafe alternative institution. ROA.250-51 (RE.98-99).

To make out a Title IX claim, "a plaintiff must show harassment that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victims are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 631 (1999). The severity and pervasiveness of the harassment must be understood in light of the gravity of the resulting deprivation of an educational opportunity or benefit that "denies its victims the equal access to education that Title IX is designed to protect." *Id.* at 652; *see Jennings v. Univ. of N.C.*, 482 F.3d 686, 696 (4th Cir. 2007) (en banc) (noting that whether the

harassment was severe and pervasive depends in part on whether the victim was effectively deprived of an educational opportunity or benefit).

"The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1312 (10th Cir. 2020) (citation omitted). Courts consider "a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Davis*, 526 U.S. at 651 (citations omitted). Courts also consider other circumstances like the frequency of the harassment and the broader school environment. *See, e.g., Jennings*, 482 F.3d at 696; *Doe v. Galster*, 768 F.3d 611, 618 (7th Cir. 2014) (noting that "relatively minor incidents could be so numerous or incessant as to qualify as severe harassment under … Title IX"). Those factors and the "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (citation and quotation marks omitted).

Courts have found that verbal harassment may be actionable. For example, an employee suffered "severe and pervasive" harassment when his co-workers "habitually called him sexually derogatory names" like "faggot," referred to him with female pronouns, and taunted him for behaving like a woman. *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 870,

872-73 (9th Cir. 2001). This Court, too, has held that an employee was subjected to "severe and pervasive" sexual harassment when her supervisor inquired about her sex life or made offensive comments of a sexual nature two or three times a week. *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996).

M.K. was similarly subjected to a pattern of near-constant daily abuse by the same group of boys that deprived him of the benefits of a public-school education. At the start of each day, two harassers would wait for M.K. by the school fence to harass him like "predator[s] waiting to pounce on something." ROA.245 (RE.93). M.K. was regularly tormented as "gay" and "gay boy" by his classmates throughout four class periods—that is, for more than half of the school day. ROA.348-49 (RE.45-46); ROA.220-22 (RE.82-84). I.L. would sit behind or near M.K. in two classes and whisper homophobic insults at him for the entire class. ROA.222-23 (RE.84-85). The harassment got so intense that M.K.'s older sister's daughter would escort M.K. out of the school building to try to protect him from the harassers. ROA.245 (RE.93).

For nearly all of sixth grade, this incessant harassment shaped M.K.'s school day from the moment he entered school to the moment he left. Having failed to take any meaningful action to respond to the harassment, the School District then turned around and suspended M.K. based on a complaint from one of M.K.'s known, chief harassers. ROA.227, 278 (RE.89,

104). Viewing the evidence in the light most favorable to M.K. and from the perspective of a person in M.K.'s circumstances, *see Oncale*, 523 U.S. at 81, a reasonable jury could view the harasser's complaint about an insignificant bathroom accident to be yet another attempt to torment M.K. And the district court's dismissive description of the harassment as only lasting for the "first month or two of the school year," ROA.364 (RE.61), critically understates the severity of the situation: this period was M.K.'s entire school year, which came to an end only when (and because) the School District effectively expelled him.

After suspending M.K., the School District later informed M.K.'s parents that he would not be allowed to return to the middle school for subsequent semesters until he attends an unsafe alternative institution for six weeks, gravely compounding the impact of the harassment on M.K.'s access to education. ROA.250-51 (RE.98-99). Considering the totality of the circumstances and construing the constellation of factors in M.K.'s favor, a reasonable jury could find that M.K. was subjected to an objectively abusive environment.

### B. The School District was deliberately indifferent to M.K.'s sex-based harassment and took affirmative steps that deprived him of educational opportunities.

The School District's response to M.K.'s sex-based harassment and to his harasser's report regarding the bathroom incident was clearly unreasonable. When a school has knowledge of harassment, "a school district [must] do

more than simply respond to harassment, it must respond *reasonably*." *Menzia v. Austin Indep. Sch. Dist.*, 47 F.4th 354, 361 (5th Cir. 2022) (citation and quotation marks omitted). Notice of "alleged sexual harassment" "triggers [a school's] duty to investigate" and then determine a reasonable course of action. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 286 (4th Cir. 2021); *see also Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 345 (5th Cir. 2022).

Put otherwise, a school is liable under Title IX if "its response, or lack thereof, to the harassment [is] 'clearly unreasonable in light of the known circumstances.'" *Sanches v. Carrollton-Farmers Branch Ind. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)). The reasonableness of a school's response depends on the context, including the school's knowledge of the severity of the harassment and its persistence, student needs, and whether the same bullies keep tormenting their peers. *See Menzia*, 47 F.4th at 361 (citing *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408-10 (5th Cir. 2015)).

A "response that a school district knows at the time of action is ineffective is clearly unreasonable." *Menzia*, 47 F.4th at 362; *see also Sanches*, 47 F.4th at 168; *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 1000 (5th Cir. 2014) (observing that a school's "knowingly ineffective interventions" supports a finding of deliberate indifference). And when a school district fails to take additional remedial steps after learning that its initial remedies

were inadequate or ineffective, it "fail[s] to act reasonably in light of the known circumstances." *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000); *see also, e.g., Menzia*, 47 F.4th at 362; *Grace v. Bd. of Tr., Brook E. Bos.*, 85 F.4th 1, 12-13 (1st Cir. 2023).

### 1. The School District ignored the repeated reports of harassment from M.K. and his parents.

The School District knew that M.K. was facing severe, persistent harassment and never took any meaningful action to investigate or address it. As just explained, when a school becomes aware of student-on-student harassment, it must conduct a basic investigation to determine the facts and reasonably respond. Thus, this Court recently reversed a grant of summary judgment when a school district, in response to a student who was sexually assaulted, could not provide evidence that it made a serious effort to investigate or protect the student from further harm. *Roe*, 53 F.4th at 345. Similarly, the First Circuit recently held that a reasonable jury could find a school deliberately indifferent when, in response to repeated reports of homophobic harassment, the school disciplined the harassers only once. *Grace*, 85 F.4th at 12-13. The court found that the school's lack of further response may have contributed to a hostile educational environment. *Id.*

A school is not deliberately indifferent, on the other hand, when it conducts a reasonable investigation and considers a reasonable course of action given the circumstances and interests at stake. Thus, a school is not deliberately indifferent to student-on-student harassment when, after a

parent lodges a bullying complaint, it promptly takes statements from both the plaintiff and the alleged harasser and considers the interests of both students before determining a course of action. *Sanches*, 647 F.3d at 168-69 (explaining that the school also took steps to separate the two students and to prevent further harm).

Similarly, a school's inaction is not deliberately indifferent if the school investigates and reasonably determines that no action is warranted. For example, in *Sanches*, when the plaintiff's mother complained to the school about a pregnancy rumor concerning her daughter, the school investigated and decided not to act because both students maintained that they did not want the rumor to spread further. 647 F.3d at 169. Deliberate indifference was lacking, then, because the school made a reasonably informed decision that accounted for both students' interests. *See id.*

The situation here is starkly different. The School District knew that M.K. was the subject of constant sex-based harassment by his classmates and never made any effort to investigate the extent of the harassment, let alone to protect M.K. The School District never considered M.K.'s interest in a safe school environment and, as a result, M.K. suffered day after day, class after class.

The School District repeatedly ignored complaints from both M.K. and his parents. M.K. reported the harassment to at least four teachers on eighteen different occasions, but the reports made no difference. He reported

bullying to his Science teacher about ten times. ROA.221 (RE.83). Although the teacher instructed the harassers to stop, she made no further remedial efforts when the students continued harassing M.K. ROA.221 (RE.83); *see* ROA.223 (RE.85) (M.K. describing Science as "the most chaotic" class).

When the harassers started calling M.K. "gay," he reported the harassment to his Band teacher but never heard or saw the teacher say anything to the harassers. ROA.221-22 (RE.83-84). In Math, I.L. intentionally sat directly behind M.K. and whispered "gay" and "gay boy" in M.K.'s ear throughout the class. ROA.222 (RE.84). M.K. reported this conduct to his teacher, Ms. Averett, at least three times. ROA.222 (RE.84). In response, Ms. Averett told both M.K. and I.L. that she "didn't want to hear it anymore"— indicating that the harassment was a bother to her and that M.K. should not complain again. ROA.222 (RE.84). M.K. never saw Ms. Averett speaking with I.L. again or addressing his harassing, sex-based conduct. ROA.222 (RE.84).

The sole action taken by the school was the Language Arts teacher's separation of I.L. and M.K. after the two fought about whether M.K. is gay. ROA.223 (RE.85). At best, this sole intervention was knowingly ineffective. Even if the separation temporarily tamped down the harassment in one class, the harassment was still ongoing throughout most of M.K.'s school day.

M.K.'s parents' reports to schoolteachers and administrators were similarly ignored. M.K.'s mother spoke with the Science teacher about the harassment, yet no steps were taken to remedy her concerns. ROA.277-79 (RE.103-05). M.K.'s father spoke with Assistant Principal Penton about other students constantly calling M.K. "gay [and] queer." ROA.247 (RE.95). Mr. Penton acknowledged the harassment and indicated that he understood that it was an ongoing issue, but the school again failed to do anything to investigate the complaints or to protect M.K. from further harm. ROA.247 (RE.95). In sum, the response to the many reports of daily harassment was effectively zero.

### 2. The School District's response to the bathroom incident was clearly unreasonable.

And then there's the bathroom incident, which led to M.K.'s effective expulsion from the School District. The School District reflexively adopted the harasser's side of the story and never made a serious effort to objectively investigate the incident before suspending M.K.—despite its knowledge of the ongoing harassment *and* that I.L. was one of M.K.'s key tormenters. *See, e.g.*, ROA.222-23 (RE.84-85) (M.K. explaining that I.L. incessantly whispered "gay" and "gay boy" at him in at least two classes).

The School District's understanding of the incident and its response were clearly unreasonable. Recall that the incident arose when the Language Arts teacher, Ms. Pierce, who had previously separated the two boys, inexplicably allowed I.L. to follow M.K. into the restroom. ROA.223, 226

(RE.85, 88). After exiting a stall, I.L. looked down into the sink mirror as M.K. was trying to "fix [him]self up" after using a urinal and saw M.K.'s genitals in the mirror. ROA.226 (RE.88). As the boys exited the restroom, I.L. started making "a goofy face" at M.K. ROA.227 (RE.89). I.L. then complained to Ms. Pierce, who asked M.K. whether he had intentionally flashed I.L. ROA.227 (RE.89). M.K. responded that he had not. ROA.227 (RE.89).

M.K. was then called to the principal's office where he was interrogated by Assistant Principal Penton, who told M.K. that I.L. had complained and accused M.K. of intentionally exposing his genitals to him. ROA.227 (RE.89). When M.K. responded that he had not, Assistant Principal Penton told M.K. to "Stop lying" "over and over and over." ROA.227 (RE.89). A reasonable jury could conclude that Assistant Principal Penton had made up his mind about what happened in the bathroom and kept pressuring M.K. until M.K. told him what he wanted to hear. *See* ROA.278 (RE.104). In other words, a reasonable jury could find it clearly unreasonable for the School District to suspend M.K. without genuinely listening to his side of the story, ignoring the severe harassment he endured at the hands of tormenters like I.L., and without seriously considering M.K.'s interest in receiving the normal, harassment-free public-school education that Title IX guarantees.

## Conclusion

This Court should reverse the district court's grant of summary judgment on M.K.'s Title IX claim against the School District and remand for further proceedings.

Respectfully submitted,

Daniel M. Waide
JOHNSON, RATLIFF
  & WAIDE, PLLC
1300 Hardy St.
Hattiesburg, MS 39404

Hasala Ariyaratne
Mariam Eskander
Claire Shennan
  Student Counsel

/s/ Brian Wolfman
Brian Wolfman
Natasha R. Khan
Regina Wang
GEORGETOWN LAW APPELLATE
  COURTS IMMERSION CLINIC
600 New Jersey Ave., NW, Suite 312
Washington, D.C. 20001
(202) 661-6582

Counsel for Plaintiff-Appellant

April 15, 2024

**Certificate of Service**

I certify that, on April 15, 2024, this brief was filed using the Court's CM/ECF system. All attorney participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Brian Wolfman
Brian Wolfman

Counsel for Plaintiff-Appellant


**Certificate of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,921 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Palatino Linotype.

/s/ Brian Wolfman
Brian Wolfman

Counsel for Plaintiff-Appellant